UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BUCHWALD CAPITAL ADVISORS, LLC,
Litigation Trustee for the Greektown
Litigation Trust,

       Appellant,                     Case No. 15-cv-14289

v.

                                        Paul D. Borman
                                        United States District Judge

DIMITRIOS ("JIM") PAPAS, *et al.*,

       Appellees.
_____

On Appeal From the United States Bankruptcy Court
For the Eastern District of Michigan

BUCHWALD CAPITAL ADVISORS, LLC,
solely in its capacity as Litigation Trustee for
the Greektown Litigation Trust,

                                Bankr. Case No. 08-53104
       Plaintiff,                 Adv. Pro. 10-05712

v.

                                  Bankr. Judge Walter J. Shapero

DIMITRIOS ("JIM") PAPAS, et al.,

       Defendants.
_____/

<u>OPINION AND ORDER AFFIRMING THE BANKRUPTCY COURT'S
NOVEMBER 24, 2015 OPINION AND DECEMBER 23, 2015 ORDER
GRANTING THE PAPAS AND GATZAROS DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND DISMISSING THEM WITH PREJUDICE
FROM THE ADVERSARY PROCEEDING</u>

    This appeal arises out of the Greektown Holdings, LLC Bankruptcy

proceedings (Bankr. Case No. 08-53104), specifically out of Bankruptcy Adversary Proceeding No. 10-05712, *Buchwald Capital Advisors, LLC, solely in its capacity as Litigation Trustee to the Greektown Litigation Trust v. Dimitrios ("Jim") Papas, Viola Papas, Ted Gatzaros, Maria Gatzaros, Barden Development, Inc., Lac Vieux Desert Band of Lake Superior Chippewa Indians, Kewadin Casinos Gaming Authority, and Barden Nevada Gaming, LLC*, in which the Plaintiff, Buchwald Capital Advisors, LLC, Litigation Trustee for the Greektown Litigation Trust ("the Litigation Trustee"), seeks to avoid certain transfers made to the Defendants that are alleged to have been fraudulent and therefore avoidable under 11 U.S.C § 544, which incorporates Michigan's Uniform Fraudulent Transfer Act, Mich. Comp. Laws §§ 566.31, *et seq.* At issue in this appeal are approximately $155 million in wire transfers made in 2005 – approximately $95 million in a transfer to Dimitrios and Viola Papas (the Papases) and approximately $60 million in a transfer to Ted and Maria Gatzaros (the Gatzaroses) (hereinafter collectively referred to as "the Papas and Gatzaros Defendants") ("the Wire Transfers").

The Bankruptcy Court, in its November 24, 2015 Opinion, concluded that the Wire Transfers were protected from avoidance under Section 546(e) of the Bankruptcy Code, 11 U.S.C. § 546(e), a "safe harbor" provision that bars a trustee's avoidance of transfers that are "settlement payments" made by or to (or for the benefit

of) a financial institution and bars avoidance of transfers that are made by or to (or for the benefit of) a financial institution in connection with a securities contract. The Bankruptcy Court granted the Papas and Gatzaros Defendants' motion for summary judgment and dismissed them from the Adversary Proceeding with prejudice on December 23, 2015.

On appeal, the Litigation Trustee argues: (1) that the Bankruptcy Court improperly weighed evidence and made erroneous factual findings in reaching its summary judgment conclusion that the Wire Transfers are entitled to safe harbor protection under Section 546(e); and (2) that the Wire Transfers were in fact dividend payments, not settlement payments, which were not made in connection with a securities contract and were not made "by" or "to" a financial institution, and thus were not entitled to safe harbor protection under Section 546(e) and are therefore avoidable under Section 544 and ultimately recoverable from the Papas and Gatzaros Defendants as "initial transferees" under Section 550(a)(1). The Papas and Gatzaros Defendants respond that: (1) all of the material facts that demonstrate the applicability of Section 546(e) to the Wire Transfers are undisputed; and (2) the Wire Transfers were "settlement payments," not dividends, and were made in connection with a securities contract and were made by a financial institution, and thus are entitled to safe harbor protection under Section 546(e).

# I.     BACKGROUND

## A.     Procedural Background

On May 29, 2008, Greektown Casino LLC ("Greektown Casino"), Greektown

Holdings LLC ("Holdings"), and other related entities filed their Chapter 11

bankruptcies.  (ECF No. 5, Designated Bankruptcy Proceeding, PgID 116.)[1]  On May

27, 2010, the Official Committee of Unsecured Creditors commenced the Adversary

Proceeding from which this appeal arises, seeking to avoid, among other things, Wire

Transfers made in 2005 to Papas and Gatzaros.  (ECF No. 5, PgID 114-150.)  The

Committee brought the action under 11 U.S.C. §§ 544 and 550 and two provisions of

the Michigan Uniform Fraudulent Transfers Act ("MUFTA"), Mich. Comp. Laws §§

566.34 and 56.35.  (ECF No. 5, PgID 114-150.)  Buchwald Capital Advisors, LLC

(the "Litigation Trustee") later substituted for the Committee.

Under 11 U.S.C. § 544(b), the Litigation Trustee is empowered to avoid

transfers made by a debtor that could be avoided by an unsecured creditor under

applicable state law.[2]  The Litigation Trustee relies on the following provisions of

---

[1]  All citations in this Opinion and Order, unless noted otherwise, will be to the relevant "PgID" in the Designated Bankruptcy Record transmitted to this Court on January 7, 2016, *e.g.* "ECF No. 5, PgID__," or to the relevant PgID in the Supplemental materials to the Designated Bankruptcy Record, ECF Nos. 12 and 13, filed with this Court on May 18, 2016, *e.g.* "ECF No. 12/13, PgID__."

[2]  Under 11 U.S.C. § 548(a)(1)(A), a trustee can avoid transfers made with actual intent to defraud.  No such claim is made in this case.  Under 11 U.S.C. §

MUFTA in bringing the claims in this Adversary Proceeding: (1) Mich. Comp. Laws § 566.34(1)(b), which permits avoidance of transfers made without receiving reasonably equivalent value in exchange for the transfer if, on the date of the transfer, the debtor knew or reasonably should have known that it would incur debts beyond its ability to pay as a result of the transfer (§ 566.34(1)(b)(ii)); and (2) Mich. Comp. Laws § 566.35, which permits avoidance of transfers made without receiving reasonably equivalent value in exchange for the transfer if the debtor was insolvent or became insolvent as a result of the transfer. The Litigation Trustee argues that the 2005 Wire Transfers were dividends made by Holdings to its owners, who subsequently and without legal compulsion used the funds to satisfy their outstanding debt obligations to Papas and Gatzaros Defendants. The Litigation Trustee argues that the dividends from Holdings to its owners were made without receipt by Holdings of reasonably equivalent value and were made at a time when Holdings knew or should have known that making the transfer would render it unable to pay its debts and/or at a time when Holdings was insolvent or that Holdings became insolvent as a result of the transfer. The Litigation Trustee seeks to avoid the "dividend" transfers from

_____

548(b)(1)(B), the "constructive fraud" provision, a trustee can avoid transfers made for "less than equivalent value." Section 548(b)(1)(B) thus parallels to some extent Mich. Comp. Laws § 544.34, but the federal provision has a two-year statute of limitations. 11 U.S.C. § 544(a)(1). Under the MUFTA, the statute of limitations is six years. Mich. Comp. Laws §§ 566.39 and 600.5813.

Holdings to its owners under 11 U.S.C. §544(b) and Mich. Comp. Laws §§ 566.34 and 566.35, and to recover those avoided amounts from the Papas and Gatzaros Defendants as the initial transferees of those voided transfers under 11 U.S.C. § 550.

On April 25, 2012, the Papas and Gatzaros Defendants moved in the Bankruptcy Court Adversary Proceeding for summary judgment on the ground that the Wire Transfers were protected from avoidance by the Litigation Trustee by 11 U.S.C. § 546(e). (ECF No. 5, PgID 211-237.) Section 546(e) is a "safe harbor" provision that prevents a trustee from avoiding certain security-related transfers. The Litigation Trustee opposed the motion. (ECF No. 5, PgID 359-578.) The Papas and Gatzaros Defendants filed a Reply in support of their Safe Harbor motion. (ECF No. 5, PgID 587-607.) On August 15, 2012, the Bankruptcy Court held a hearing on the motion. (ECF No. 5, PgID 608-670, Transcript of 8/15/12 Hearing.) The Papas and Gatzaros Defendants then submitted supplemental post-hearing briefing, (ECF No. 5, PgID 671-692,) as did the Litigation Trustee, (ECF No. 5, PgID 696-717).

On November 24, 2015, after the failure of several different efforts to resolve certain aspects of the underlying Adversary Proceeding through settlement, the Bankruptcy Court entered the Opinion and Order that are the subject of this appeal. United States Bankruptcy Judge Walter J. Shapero found that the Wire Transfers to the Papas and Gatzaros Defendants were protected from avoidance by the safe harbor

provision, granted the Papas and Gatzaros Defendants' motion for summary judgment and dismissed them from the MUFTA Adversary Proceeding. (ECF No. 5, PgID 836-72.) The Litigation Trustee filed its Notice of Appeal on December 8, 2015, and filed its Amended Notice of Appeal on January 4, 2016. (ECF No. 5, PgID 53-99.) The Papas and Gatzaros Defendants filed a Notice of Cross-Appeal, which was withdrawn by stipulation of the parties on April 26, 2016. (ECF No. 11.)

This Court held a hearing on the appeal on February 27, 2017. On March 2, 2017, the Court ordered the parties to participate in facilitative mediation. (ECF No. 22, Order of Referral to Facilitative Mediation.) The parties did attempt to resolve this matter, engaging in a facilitation before former United States District Chief Judge Gerald R. Rosen in combination with the facilitation of a related bankruptcy appeal arising out of the same Adversary Proceeding, *Greektown Holdings, LLC v. Sault Ste. Marie Tribe of Chippewa Indians, et al.*, E.D. Mich. No. 16-13643, also currently pending before this Court and resolved in a separate Opinion and Order issued this same day. On September 26, 2017, the parties informed this Court that the combined facilitation was unsuccessful, necessitating the Court's resolution of this appeal.

## B.    Factual Background

The Greektown Casino was licensed by the Michigan Gaming Control Board ("MGCB") to own and operate a casino in downtown Detroit, Michigan, which

opened for operation in November, 2000. (ECF No. 13, PgID 2134.)[3] The Papas and

Gatzaros Defendants, prior to 2000, owned 86% of the membership interests of

Monroe Partners, LLC ("Monroe"). (ECF No. 5, PgID 963; ECF No. 13, PgID 2418.)

Monroe owned 50% of Greektown Casino and Kewadin Greektown Casino, LLC

("Kewadin") owned the other 50% of Greektown Casino. (ECF No. 5, PgID 965.)

The Kewadin Casino Gaming Authority ("the Authority") owned 100% of Kewadin

and the Sault Ste. Marie Tribe of Chippewa Indians ("the Tribe") owned 100% of the

Authority. (ECF No. 5, PgID 965, 1131; ECF No. 12, PgID 2089.)

On July 28, 2000, the Papas and Gatzaros Defendants each entered into an

Amended and Restated Limited Liability Company Redemption Agreement with

Monroe according to which Monroe redeemed all membership interests of Papas and

Gatzaros in exchange for specified installment payments (the "2000 Redemption

Agreements"). Kewadin purchased the membership interests that were transferred by

the Papas and Gatzaros Defendants to Monroe, and became obligated along with

Monroe to satisfy the redemption obligations to the Papas and Gatzaros Defendants.

(ECF No. 13, PgID 2340-2447; ECF No. 13, PgID 2448-87.)

---

[3] The facts repeated here are undisputed and largely as set forth by the Litigation
Trustee in its brief on appeal. Although the Litigation Trustee argues that the
Bankruptcy Court impermissibly resolved disputed factual issues, the Court disagrees.
The Litigation Trustee simply disagrees with the law that Judge Shapero applied to
these undisputed facts. The facts recited here cannot be genuinely disputed.

Under the terms of the July 28, 2000 Redemption Agreements, Papas and Gatzaros surrendered their membership interests in Monroe:

> (e) **<u>Effect of Closing.</u>**  It is the intention of the Parties that the redemption of the Retiring Member's Redeemed Monroe Interests pursuant to this Agreement shall completely divest the Retiring Member of all authority, influence, control, rights and benefits associated with such Redeemed Monroe interests.  This means that, without limitation, from and after the Closing, the Retiring Member shall not retain an interest in, or be entitled to receive any distributions of, any membership interests or assets of Monroe, except the Retiring Member's allocable portion of the Redemption Amount.

(ECF No. 13, July 28, 2000 Amended and Restated Limited Liability Company Redemption Agreement among Monroe and Papas, PgID 2354.)

Between July 2000 and June 2005, Papas and Gatzaros received more than $66 million in payments under the 2000 Redemption Agreements.  (ECF No. 13, PgID 2530-31.)  None of these payments are challenged in the underlying Adversary Proceeding.  However, during this time period, Monroe did default on its installment payments to the Papas and Gatzaros Defendants and the debt owed under the 2000 Redemption Agreements was restructured several times.  (ECF No. 13, PgID 2490.)  In November, 2004, Papas and Gatzaros each entered into a Confidentiality and Standstill Agreement with Monroe, the Authority, the Tribe, Kewadin and Greektown Casino to allow the parties to explore alternative solutions to Monroe's defaults, and on February 10, 2005 and March 10, 2005, the Standstill Agreements were amended

further by letter agreements.  (ECF No. 13, PgID 2488-89, PgID 2506-08.)  Through the letter agreements, the Papases agreed to a discounted cash buy-out of $94,860,000 (leaving $50,000,000 outstanding) and the Gatzaroses agreed to a partial payment of $55,000,000 (leaving $50,000,000 outstanding).  (ECF No. 13, PgID 2508.)  To effectuate the debt restructuring under the modified Redemption Agreements, the transactions necessary to fund the payments to the Papas and Gatzaros had to close by December 31, 2005.  (ECF No. 13, PgID 2508-09.)  Papas and Gatzaros retained an option to obtain a 2% interest in Monroe (ECF No. 13, PgID 2509-10) and retained a right to "compel the sale of substantially all of the assets or the equity ownership interests in Greektown Casino owned directly or indirectly by the Sault Tribe" upon default.  (ECF No. 13, PgID 2515.)

In the summer of 2005, Greektown Casino undertook a refinancing and recapitalization of its debt, specifically the Casino's existing senior debt and the debt owed to the Papas and Gatzaros Defendants.  (ECF No. 5, PgID 1046, 1094.)  The transaction required the approval of the MGCB.  At its September 13, 2005 Regular Meeting, proponents of the debt restructuring informed the MGCB as follows:  "In order to satisfy [the redemption obligations to the Papas and Gatzaros], Greektown desires . . . to issue senior subordinated notes to satisfy these obligations."  (ECF No. 12, MGCB September 13, 2005, Regular Public Meeting, PgID 2089.)  The MGCB

was concerned that Greektown Casino would become liable for the redemption obligations to Papas and Gatzaros. The MGCB was also concerned that Greektown Casino, if it were to guarantee the refinancing, would have to generate sufficient revenue over the following five years to pay over $80 million to the Gatzaroses. (ECF No. 12, MGCB November 15, 2005, Special Public Meeting PgID 1146.) Thus, the MGCB rejected the transaction initially, refusing to permit Greektown Casino to become liable for any of the funds to be borrowed. (ECF No. 5, PgID 1132.)

In response, and to satisfy the concerns of the MGCB, a proposal was made to the MGCB to form an intermediate holding company for Greektown Casino, Greektown Holdings, LLC ("Holdings") and its subsidiary Greektown Holdings II, Inc. ("Holdings II"), to borrow the funds that would ultimately be used to make the lump sum payments to Papas and Gatzaros. (ECF No. 5, PgID 564, 1132, 1144-47; ECF No. 13, PgID 2005, 2021-35, 2134; ECF No. 12, PgID 2005, 2021-35, 2087-2109.) In a "Request for Approval of Permanent Financing" submitted to the MGCB on October 26, 2005 ("the Approval Request"), the proponents of the restructuring stated:

> The sources and uses of the funds to be received by [Holdings] pursuant to the issuance of the [Senior] Notes are as follows. Please note that the proceeds from the Senior Notes (for which Greektown Casino is not liable), rather than the proceeds from the New Credit Agreement, will be used to satisfy the redemption obligations to the Papases and the Gatzaroses. Under the proposed Financing Arrangements, the direct and

11

indirect owners of [Casino] are merely replacing the obligations to the Papases and Gatzaroses with obligations to a set of institutional investors, with no direct recourse against Greektown [Casino].

*In re Greektown Holdings*, 2015 WL 8229658, at *9. The letter provided that the proceeds from the Senior Notes would be used, among other things, to make payments to the Papases and Gatzaroses of approximately $93 million and $60 million respectively. *Id*.

The final Order of the MGCB approving the restructuring of Greektown Casino's financing provided that Merrill, Lynch, Pierce, Fenner & Smith ("MLPFS") had agreed to purchase $185 million in senior subordinated Notes that would be used to provide the cash to make payments to the Papases and Gatzaroses. (ECF No. 5, November 15, 2005 Order Approving Transfer of Ownership in Greektown Casino, LLC from Monroe Partners and Kewadin Greektown Casino to Greektown Holdings ("MGCB Approval Order") at 6, PgID 1633.) The MGCB Approval Order required that Holdings use the funds obtained from the sale of the Notes as described in the Approval Request letter. (*Id*. at 6.) The MGCB Approval Order further provided that a failure to make the payments to the Papas and Gatzaros Defendants as outlined in the Approval Request letter would obligate the Tribe to make the payments within 30 days or the MGCB would have the right to force a sale of the Greektown Casino. (*Id*. at 7.) The MGCB Approval Order made clear that "Greektown [Casino LLC] will not

guaranty the obligations of Greektown Holdings and Greektown Holdings II under [the Senior Notes]."

As a condition of the restructuring, in September, 2005, Kewadin and Monroe each had conveyed their 50% ownership interest in Greektown Casino to the newly-formed Holdings and received in exchange 100% of the ownership interest in Holdings. (ECF No. 5, MGCB Order Approving Transfer of Interest, PgID 248-49.) Holdings had no other assets apart from the membership interests in Greektown Casino. (ECF No. 13, PgID 2134.)

Following approval by the MGCB, on November 22, 2005, Holdings and Holdings II, together with their underwriter Merrill Lynch & Co. ("Merrill Lynch") issued the Offering Memorandum for the Senior Notes in the amount of $185,000,000. (ECF No. 13, PgID 2128-2297.) MLPFS was the initial purchaser of the $185 million, along with Wachovia Capital Markets, LLC and NatCity Investments, Inc. (ECF No. 13, PgID 2262.) The Offering Memorandum explains that in July, 2005, "two former members of Monroe," i.e. the Papases and Gatzaroses, agreed to accept a discount on the payments due to them under a July, 2000 redemption agreement if the amounts owing to them are paid in full by December 31, 2005. The Offering Memorandum described the background of the redemption and standstill and subsequent letter agreements and explained that the proceeds of the

Senior Note issuance would be used in part to fund the redemption obligations of Monroe to the Papases and Gatzaroses: "Additionally, certain proceeds of this offering will be distributed to Kewadin Greektown and Monroe LLC to pay the installment amounts owing to" the Papas and Gatzaros Defendants. (ECF No. 13, PgID 2140.)

The Offering Memorandum described the "Use of Proceeds" in part as follows: "Concurrently with the closing of the offering of the notes, we [Holdings] will dividend certain of these proceeds to Kewadin Greektown and Monroe LLC, which will use the funds to pay [Papas and Gatzaros]." (ECF No. 13, PgID 2163.) Also on November 22, 2005, Holdings, Merrill Lynch and MLPFS entered into a Note Purchase Agreement for the purchase of $165,500,000 of the Senior Notes (the "NPA"), which bound the initial purchasers of the Senior Notes to its terms. (ECF No. 13, PgID 2299-2329.) In the NPA, Holdings covenants that "[it] will use the net proceeds received by it from the sale of the securities in the manner specified in the Offering Memorandum under "Use of Proceeds." (ECF No. 13, PgID 2310, § 3(g).)

On December 1, 2005, the Papas and Gatzaros Defendants each entered into separate letter agreements with Kewadin, Monroe, the Tribe and the Kewadin Gaming Authority, acknowledging that the $155 million in transfers they expected to be paid to them from the proceeds of the sale of the Senior Notes by Holdings would be in satisfaction of the amounts then owed to them under the Redemption Agreements and

14

amendments.  (ECF No. 5, PgID 563-73, 575-77.) ("The 2005 Letter Agreements"). Both of the 2005 Letter Agreements required the payments under those Agreements to be made on or before December 2, 2005.

On December 2, 2005, in a series of "simultaneously occurring" transactions, Holdings and Holdings II borrowed $190,000,000 through a new secured credit facility and issued the Senior Notes in the principal amount of $185,000,000.  (ECF No. 5, PgID 120; ECF No. 13, Offering Memorandum, PgID 2140, 2163.)  Holdings used the funds raised through the secured credit facility to contribute $190,000,000 to Greektown Casino to repay its then existing credit facility, (ECF No. 13, PgID 2140, 2163 & 2332-35), and declared a dividend of the remainder of the money (the proceeds of the Note sale) to its owners, Monroe and Kewadin.  (ECF No. 13, PgID 2163) ("Concurrently with the closing of the offering of the notes, we will dividend certain of these proceeds to Kewadin Greektown and Monroe LLC, which will use the funds to pay former members of Monroe LLC.").  More specifically, Holdings received $190,000 pursuant to the new credit agreement and $182,582,562 in aggregate proceeds pursuant to the NPA.  (ECF No. 13, Flow of Funds Memorandum, PgID 2332, 2330-39.)[4] Holdings used the funds received pursuant to the NPA to

_____

[4] The Flow of Funds Memorandum, sets forth the "fund transfer procedures followed in connection with the transactions contemplated by the following documents," including the 2000 and 2005 Redemption and Letter Agreements between Monroe,

transfer $110,232,634.07 and $34,255,960.03 to Kewadin and Kewadin used these proceeds in part to pay Monroe "pursuant to the terms of the Papas and Gatzaros Agreements." (ECF No. 13, PgID 2333-34.) Monroe used those funds to pay the Papas and Gatzaros Defendants pursuant to the Letter Agreements. (ECF No. 13, PgID 2334.) The parties acknowledged, in the Flow of Funds Memorandum, "that for the sake of efficiency, the following actual net transfers were made," by Holdings through their bank account at MLPFS: (1) $90,491,741.62 to the Papases (the Papas Wire Transfer"); (2) $55,000,000 to the Gatzaroses ("the Gatzaros Wire Transfer"). (ECF No. 13, PgID 2337.)

## II.    JURISDICTION AND STANDARD OF REVIEW

The parties submit that this Court has jurisdiction, under 28 U.S.C. § 158(a)(1), to entertain the Litigation Trustee's appeal of Judge Shapero's November 24, 2015 Summary Judgment ruling and December 23, 2015 Order dismissing the Papas and Gatzaros Defendants from this Adversary Proceeding.[5] Under 28 U.S.C. § 158(a)(1), this Court has jurisdiction to hear appeals "from final judgments, orders, and decrees"

_____

Kewadin and the Papas and Gatzaros Defendants, and the NPA. (ECF No. 13, PgID 2331.)

[5] In an Opinion and Order issued on February 24, 2016, this Court denied the Papas and Gatzaros Defendants' request, made pursuant to 28 U.S.C. § 158(d)(2)(B), to certify this matter for direct appeal to the United States Court of Appeals for the Sixth Circuit. (ECF No. 7, Opinion and Order Denying Request for Certification).

issued by the Bankruptcy Court. In his December 23, 2015 Order of Dismissal, Judge

Shapero certified his Dismissal Order as final pursuant to Fed. R. Civ. P. 54(b) and

Fed. R. Bankr. Pro. 7054. (Bankr. Adv. Pro.10-05712, ECF No. 706, Order of

Dismissal With Prejudice of Defendants Dimitrios ("Jim") Papas, Viola Papas, Ted

Gatzaros and Maria Gatzaros Pursuant to Their Motion For Summary Judgment Under

11 U.S.C. § 546(e).)

## III.   ANALYSIS

The Litigation Trustee, as the representative of the Original Noteholders and

successors in interest to the holders of the Senior Notes, is seeking to recover the

proceeds of the NPA that were wire transferred by MLPFS to the bank accounts of the

Papas and Gatzaros Defendants. The Papas and Gatzaros Defendants assert, and the

Bankruptcy Court found, that the Wire Transfers are protected from avoidance by the

Litigation Trustee under the Safe Harbor provision of 11 U.S.C. § 546(e), which

states:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this
> title, the trustee may not avoid a transfer that is a margin payment, as
> defined in section 101, 741, or 761 of this title, or settlement payment,
> as defined in section 101 or 741 of this title, made by or to (or for the
> benefit of) a commodity broker, forward contract merchant, stockbroker,
> financial institution, financial participant, or securities clearing agency,
> or that is a transfer made by or to (or for the benefit of) a commodity
> broker, forward contract merchant, stockbroker, financial institution,
> financial participant, or securities clearing agency, in connection with a
> securities contract, as defined in section 741(7), commodity contract, as

17

> defined in section 761(4), or forward contract, that is made before the
> commencement of the case, except under 548(a)(1)(A) of this title.

11 U.S.C. § 546(e). As relevant here, § 544 permits a trustee to avoid certain fraudulent transfers and 11 U.S.C. § 550 provides that, to the extent that a transfer is avoided under Section 544, the trustee is permitted to recover that amount (or property) from the initial transferee of that amount (or property).

The parties agree that the Section 546 safe harbor defense to a transfer that is otherwise avoidable under Section 544 applies only in two circumstances as relevant here: (1) it prevents the trustee from avoiding a transfer "that is a settlement payment made by or to (or for the benefit of) a . . . financial institution . . .," and (2) it prevents the trustee from avoiding a transfer made by or to (or for the benefit of) . . . financial institution . . . in connection with a securities contract. Here, the Litigation Trustee asks the Court to disaggregate the transactions that were in fact simultaneously executed as contemplated and directed by the MGCB Order, the Offering Memorandum, the Flow of Funds Memorandum, and the NPA, and to find that the initial "transfer" of the proceeds of the sale of the Notes from Holdings to Monroe and Kewadin was a dividend issued by Holdings to Monroe and Kewadin without receipt of reasonably equivalent value (that rendered Holdings insolvent) and therefore

avoidable under Section 544 and not subject to safe harbor under Section 546(e).[6] Having thus avoided that initial transfer under Section 544, the Litigation Trustee reasons, it has the right under Section 550 to recover that amount from the Papas and Gatzaros Defendants, who were the initial transferees of an avoided transfer and who cannot invoke the Section 546(e) safe harbor provision to protect an avoided transfer in a recovery action under Section 550. Counsel for the Litigation Trustee summarized this position at the summary judgment hearing before Judge Shapero:

> Now, there's – technically 546(e) [the safe harbor defense] applies only to 544, and it only applies as a defense to avoidance of the transfer. . . . What we have here is a dividend that is being transferred to the owners [Monroe and Kewadin] for the benefit of the owners [Monroe and Kewadin], but it was transferred directly to the Papas and Gatzaros defendants. It [the safe harbor defense] does not apply to Section 550, and it does not protect a person from whom the trustee seeks to recover property that was the subject of an avoided transfer. That's exactly what we have here. If we avoid the transfer [from Holdings to Monroe and Kewadin], which is the dividend, under 550 I'm entitled to recover from the initial transferee, which are the Papases and Gatzaroses. This money was a dividend. It was paid to the owners [Monroe and Kewadin] for the benefit of the owners of Greektown Holdings, and it was paid directly to the Papases and Gatzaroses. They [the Papas and Gatzaros Defendants] seem to confuse that 546(e) somehow applies to the direct transfer to them. No. You have to analyze the transfer, which is the dividend. Now, I suggest that the Court here only has to decide whether the

---

[6] The issue of Holdings' insolvency at the time of the 2005 transfer only becomes relevant if the Litigation Trustee can establish that the transfers were made without receipt of reasonably equivalent value. Thus, the insolvency issue is not before this Court and would be subject to further evidentiary development if this Court were to reverse Judge Shapero's Order and return this matter to the Bankruptcy Court.

dividend to the owners of Greektown Holdings is subject to the 546(e) defense. I believe it clearly is not . . . .

\* \* \*

Once the initial purchasers [MLPFS, Wachovia, and Nat City] paid the monies to Greektown Holdings' account, which they did, the transaction was completed. The note purchase agreement or the purchase agreement was totally completed. What was done with the proceeds of the transaction was a new, a different transaction, and that's the dividend I'm asking your honor to focus on. The Section 546(e) defense is based on the use of proceeds from the sale of the notes by Holdings, and it must fail because the dividend stands on its own as an entirely separate independent transfer. . . . Greektown Holdings' transfer of the cash that was raised as a result of the sale of the notes was separate and independent of the securities contract [the NPA]. The transfers [to the Papas and Gatzaros Defendants] were not made in order to complete the securities transaction. That was complete once the funds were distributed to Greektown Holdings in its account at Merrill Lynch. So in sum, your Honor, the dividends to the owners of Greektown Holdings [Monroe and Kewadin] were not settlement payments, and they were not made in connection with a securities contract.

(ECF No. 5, Transcript of August 15, 2012 Oral Argument before the Bankruptcy Court, 36-37 and 57-59, PgID 643-44, 664-666.) The Litigation Trustee similarly summarized the argument in its brief on appeal to this Court. "Plaintiff sues under Section 544 to avoid fraudulent transfers in the amount of $155 million made by Holdings for the benefit of Kewadin and Monroe. . . . The avoidable transfers were dividends to the owners of Holdings, declared, as are all dividends, for no consideration. . . . The relevant portions of Section 546(e) . . . do not bar avoidance of a dividend declared by a non-financial institution [Holdings] for the benefit of its

non-financial institution owners [Monroe and Kewadin]. [] Section 546(e) does not bar the avoidance of the Dividends, and, once they are avoided, it has no effect whatsoever on the right, created by Section 550(a), to recovery [of] the transfers from their initial transferees [under Section 550(a)]." (ECF No. 18, Appellant's Opening Brief on Appeal at 11, 14, PgID 2587, 2590.)

For the reasons that follow, this Court rejects the Litigation Trustee's position and concludes that the Bankruptcy Court reached the correct conclusion regarding the nature of the 2005 Transaction. The Litigation Trustee urges the Court to adopt a myopic view the 2005 Transaction, that focuses solely on the dividend from Holdings to Monroe and Kewadin and ignores every other document and undisputed fact in the record. However, as discussed *infra*, this view of the 2005 Transaction ignores the undisputed factual realities that: (1) Holdings was formed, at the insistence of and with the approval of the MGCB, for the express purpose of satisfying the redemption obligations to the Papas and Gatzaros Defendants; (2) the sole purpose of the Note issuance, as fully disclosed to the Noteholders in the Offering Memorandum, the Flow of Funds Memorandum, and the NPA, was to obtain funds to make the payments to the Papas and Gatzaros Defendants; and (3) in a unified series of transactions deemed to have occurred simultaneously, the proceeds of the securities transaction were wired directly from Holdings' brokerage account at MLPFS to the bank accounts of the

Papas and Gatzaros Defendants, as understood and expected by all parties who devised, sanctioned, and/or were parties to the Note sale. The Litigation Trustee's position also ignores the legal reality that Holdings: (1) entered into a covenant under the NPA to use the proceeds of the sale of the Notes only as directed in the Offering Memorandum's "Use of Proceeds" section, *i.e.* to pay the amounts owed to the Papas and Gatzaros Defendants, and (2) was directed by the November 15, 2005 Order of the MGCB to use the proceeds only as described in the October 27, 2005 Approval Request, *i.e.* to pay the amounts owed to the Papas and Gatzaros Defendants. The totality of these circumstances leads this Court to find both (1) that the Wire Transfers to the Papas and Gatzaros Defendants were settlement payments made by or to or for the benefit of a financial institution, and (2) that the Wire Transfers were made by or to or for the benefit of a financial institution in connection with a securities contract. Either finding provides an independent basis to affirm Judge Shapero's November 24, 2015 Summary Judgment Opinion and December 23, 2015 Order of Dismissal.

### A.    The Bankruptcy Court's Opinion

In his November 24, 2015 Opinion, Judge Shapero held that the 2005 Wire Payments were (1) settlement payments made by or to a financial institution, and also (2) were transfers made by a financial institution in connection with a securities contract. *In re Greektown Holdings, LLC et al.,* Adv. Pro. No. 10-05712, 2015 WL

8229658 (E.D. Mich. Bankr. Nov. 24, 2015). The Bankruptcy Court succinctly

summarized the undisputed facts, largely comporting with the facts as set forth *supra*,

as follows:

> Prior to 2000, Dimitrios and Viola Papas (together, "the Papases") and Ted and Maria Gatzaros (together, "the Gatzaroses") collectively owned approximately 86% of the membership interests in Monroe Partners, LLC ("Monroe"). Monroe, in turn, owned a 50% interest in Greektown Casino, LLC ("Greektown Casino") and Kewadin Greektown Casino, LLC ("Kewadin") owned the other 50% interest. Greektown Casino owned and operated a casino in downtown Detroit, Michigan. By agreement dated on or about July 28, 2000 ("the 2000 Redemption"), Monroe purchased and redeemed the membership interests of the Papases and the Gatzaroses (together, "Defendants") in exchange for Monroe's agreement to pay Defendants specified future installment payments. Incident and contemporaneously thereto, Kewadin became the owner of equivalent membership interests in Monroe and also obligated itself to make these installment payments. Thus, as a result of the 2000 Redemption, Monroe and Kewadin became obligated to make the installment payments to Defendants. Such payments were indeed made for some time.

> In 2005, the indicated parties entered into agreements that, among other things, provided for a settlement and payment of the balances then owing to Defendants ("the 2005 Transaction"). The Papases agreed to a discounted payment in full of about $95 million, and the Gatzaroses agreed to a partial payment of about $55 million, leaving an outstanding balance of about $50 million. The 2005 Transaction had other financial aspects. The most relevant aspect was that the source of the money to be used to pay Defendants the indicated sums would be obtained pursuant to a reorganization of Greektown Casino's corporate and financial structure. To that end, in September 2005, Monroe and Kewadin incorporated Greektown Holdings, LLC ("Holdings"), with Monroe and Kewadin each owning a 50% interest in Holdings, and with each transferring to Holdings all of their interests in Greektown Casino. Aside from Greektown Casino, Holdings' only other asset was a wholly-owned

subsidiary Greektown Holdings II, Inc. In the latter part of 2005, and incident to and in contemplation of the 2005 Transaction, the following events took place:

(a) Holdings issued approximately $182 million in unsecured senior notes ("Senior Notes") to be purchased by Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") pursuant to a Note Purchase Agreement;

(b) Merrill Lynch sold the Senior Notes to certain qualified institutional purchasers;

(c) The net proceeds from the indicated sale of the Senior Notes was used (primarily, but not solely) to make the agreed-upon payments to Defendants;

(d) On November 8, 2005, the Michigan Gaming Control Board (MGCB) approved by written order the transfer of Monroe and Kewadin's interests in Greektown Casino to Holdings. Dkt. 266 Ex. 5–A. Consummation of the 2005 Transaction required the MGCB's approval, as it is the Michigan state agency with jurisdiction over casino licensure and regulation. See Mich. Comp. Laws § 432.204(1); Mich. Admin. Code r. § 432.1509;

(e) On November 15, 2005, the MGCB also issued a written order approving the 2005 Transaction, including as a specific condition the referred-to payments to Defendants. Dkt. 266 Ex.5–B;

(f) On November 22, 2005, Holdings and Merrill Lynch issued an Offering Memorandum covering the Senior Notes. It specifically described the 2000 Redemption and further indicated that the proceeds of the offering would be distributed to effectuate the indicated and contemplated payments to Defendants (specifically, by way of a distribution to Monroe and Kewadin, which would then make distributions to Defendants). Dkt. 266, Ex. 5–C at 7.

The Offering Memorandum's "Use of Proceeds" section indicated that "[c]oncurrently with the closing of the offering of the notes, [Holdings] will dividend" approximately $170 million to Monroe and Kewadin, which will use the funds to pay former members of Monroe (i.e. Defendants). *Id.* at 30. The November 22, 2005 Note Purchase Agreement between Merrill Lynch (on its own behalf and on behalf of the identified initial purchasers of the Senior Notes) and Holdings included a covenant providing that Holdings will use the net proceeds of the Senior Note sale as specified in the referred-to Offering Memorandum's "Use of Proceeds" section. Dkt. 266, Ex. 5–D at 11; and

(g) On December 2, 2005, Holdings issued the Senior Notes to Merrill Lynch and, on the same day, Holdings directly made those indicated payments by wire transfers from Merrill Lynch to the Papases' and Gatzaroses' bank accounts with Chase Manhattan Bank and Comerica Bank, respectively ("Wire Payments").

Greektown Casino, Holdings, Monroe, Kewadin, and other related entities filed their Chapter 11 bankruptcies on May 29, 2008. Following confirmation of a Chapter 11 plan on January 22, 2010, the Litigation Trustee ("Plaintiff"), appointed under the plan, sought to avoid, among other things, the Wire Payments that Holdings made to Defendants. Plaintiff brought this action under 11 U.S.C. §§ 544 and 550 and two provisions of the Michigan Uniform Fraudulent Transfer Act: Mich. Comp. Laws §§ 566.34 and 566.35.

2015 WL 8229658, at *1-3 (footnotes omitted). These facts are undisputed and are supported by the underlying record exhibits from which they derive.[7]

---

[7] Before addressing the substance of the section 546(e) arguments, the Bankruptcy Court disposed of the Litigation Trustee's argument, which the Litigation Trustee continues to press on appeal, that the Papas and Gatzaros Defendants failed to comply

Judge Shapero concluded, relying on these undisputed facts, that there had been a "triangular exchange of consideration" among: (1) Holdings, (2) Monroe/Kewadin and (3) Papas/Gatzaros:

> As part and parcel of the 2005 Transaction, there existed a clear triangular exchange of benefits and burdens, each aspect being reciprocal and supported by consideration. Holdings, although not bound to do so, voluntarily and by the consent of all the involved parties, undertook the obligation to settle and assume Monroe and Kewadin's prior obligations to Defendants using the Senior Notes proceeds. In exchange for undertaking this burden, Holdings benefitted by obtaining from Monroe and Kewadin a 100% interest in Greektown Casino, which constitutes consideration that Holdings received. Although Monroe and Kewadin surrendered to Holdings their direct ownership interests in Greektown Casino, they benefitted by being relieved of their obligations to pay Defendants on the debts from the 2000 Redemption. Defendants settled the installment amounts owing to them and benefitted by being paid immediately.

2015 WL 8229658, at *7. To summarize, the Bankruptcy Court viewed the many transactional facets related to the 2005 Transaction as a single transaction for purposes

---

with Fed. R. Civ. P. 56, which required the moving party to set forth the material facts as to which there was no genuine dispute. The essence of the Litigation Trustee's argument appears to be that Papas and Gatzaros, in their Answer to the Litigation Trustee's Complaint in this Adversary Proceeding, denied certain facts that Papas and Gatzaros now appear to accept as true and in fact rely upon in moving for summary judgment. Judge Shapero took a practical approach to this argument, which this Court does as well. None of the parties disputes the authenticity of the pertinent written agreements or other evidence that the parties relied on in their summary judgment briefing. To the extent that this Court relies solely on evidence as to which there is no dispute, there would simply be no *genuine* issue of fact that would preclude summary judgment.

of analysis, explaining:

> What must be concluded from these undisputed occurrences is that the Senior Note transaction, from its inception, was principally intended to restructure and pay Monroe and Kewadin's debts owed to Defendants. Whether viewed subjectively or objectively, the Wire Payments to Defendants were a, if not the, primary contemplated end result of the Senior Note securities transaction and a predominant and inextricable aspect thereof. In a sense, the Wire Payments made to Defendants were more or less the 2005 Transaction's raison d'être, and no other component would have been contemplated or would have occurred without the Wire Payments. As to the binding commitment test, Plaintiff argues that Defendants were not parties to the Note Purchase Agreement, which, as noted, provided that the Senior Note proceeds be used to make the Wire Payments. Because the first step in the 2005 Transaction was the exchange of the Senior Notes and money between Holdings and Merrill Lynch, the relevant focus should be on whether that step created a legal obligation on Holdings to use that money to make the Wire Payments. The source of the obligation and the identity of the obligor are of minor relevance at best, and in any event serve only as non-dispositive contextual facts. It is clear that Holdings was legally obligated to use the proceeds as stated, lest it be in breach of its obligations to the noteholders or in violation of the MGCB's order. Insofar as Plaintiff argued that such obligations were always subject to amendment and without Defendants' consent, that argument is irrelevant because the perspective of the Court's analysis (which is confirmed by the binding commitment test) is when the first step of the transaction occurs, not at some later hypothetical date and under different hypothetical circumstances. Even this stringent and infrequently utilized test weighs strongly against Plaintiff's deconstruction/bifurcation argument.

> The Court is therefore not persuaded by Plaintiff's arguments, which do not serve to raise any genuine issues of material fact. The Court's opinion should not be seen as formally merging or amalgamating separate component transactions, but rather as simply and appropriately seeing them as components of as a single whole.

2015 WL 8229658, at *10. This reasoning supported the Bankruptcy Court's ultimate

conclusion that the Wire Transfers "were transfers of money made to complete the 2005 Transaction, which was a securities transaction," and therefore were settlement payments under § 546(e). *Id*. at 8. Further, because there was no dispute that the Wire Payments were made by way of wire transfers between financial institutions, and because the Sixth Circuit has held that a financial institution need play no special role and need obtain no beneficial interest in the funds transferred, the payments satisfied the requirement that they be "by or to a financial institution." *Id*. at *15. The Bankruptcy Court thus concluded that "Defendants have met the necessary requirements of § 546(e) and have proven that Plaintiff cannot avoid the Wire Payments because they are settlement payments made by or to a financial institution." *Id*.

The Bankruptcy Court also granted the Defendants safe harbor from avoidance on the separate and independent basis that the Wire Transfers were made "in connection with a securities contract," *i.e.* the NPA. 2015 WL 8229658, at *16-17. Noting the distinction between the requirement of the first safe harbor exception, *i.e.* that the transfer be made "to complete a securities transaction," and the less onerous requirement of the second safe harbor exception, *i.e.* that the transfer be made "in connection with a securities," the Bankruptcy Court found that connection easily demonstrated here:

As noted, the Wire Payments were described and contemplated in the Note Purchase Agreement as transfers that were to occur "concurrently" with the Senior Note transaction, and the Flow of Funds Memorandum deemed the several transactions to have occurred "simultaneously." Holdings was legally bound to use the Senior Note proceeds to pay Defendants. In other words, the "connection" not only existed, it was a thoroughly contemplated and mandatory connection. . . . The Wire Payments were transfers made by a financial institution in connection with a securities contract: the Note Purchase Agreement, and therefore there exists no genuine issue of material fact or persuasive legal argument to the contrary. Accordingly, Defendants are entitled to summary judgment on this basis and Plaintiff cannot avoid the Wire Payments.

2015 WL 8229658, at *17.

For the reasons that follow, the Court concludes that Judge Shapero reached the right conclusion as to both the settlement payment and the securities contract safe harbor defenses.

## B.     A Settlement Payment Made By or To a Financial Institution

The parties are in agreement, and the Bankruptcy Court acknowledged, that "[i]n the securities industry, a settlement payment is generally the transfer of money or securities made to complete a securities transaction." *In re Greektown Holdings*, 2015 WL 8229658, at *4 (quoting *Resorts Intern., Inc. v. Lowenschuss*, 181 F.3d 505, 515 (3d Cir. 1999)). The Safe Harbor provision at issue here, 11 U.S.C. § 546(e), refers to the definition of "settlement payment" set forth in 11 U.S.C. § 741(8). Section 741(8) defines settlement payment as "a preliminary settlement payment, an

interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." Several courts, including the Sixth Circuit, have noted that this definition, while "somewhat circular," is "extremely broad." *In re QSI Holdings, Inc.*, 571 F.3d 545, 549 (6th Cir. 2009) (citing cases) (internal quotation marks and citations omitted). Some courts have stressed the stated legislative purpose of § 546 to "protect *publicly* traded security markets from market volatility caused by bankruptcy," and have accordingly limited § 546's reach to publicly traded securities transactions. The Sixth Circuit, however, has rejected this narrow interpretation and expressly held that § 546 applies to a settlement payment involving privately held securities. *QSI*, 571 F.3d at 550 (emphasis in original). The Sixth Circuit in *QSI* interpreted the "critical final phrase" in the §741(8) definition, that the payment be one "commonly used in the securities trade," to be a "a catchall phrase intended to underscore the *breadth* of the § 546(e) exemption." 571 F.3d at 550 (emphasis in original) (internal quotation marks and citation omitted). In *QSI*, the Sixth Circuit determined that the payments made to the debtor's shareholders in a leveraged buyout of a privately held company were "settlement payments," concluding:

> This case . . . considers a transaction with the characteristics of a common leveraged buyout involving the merger of nearly equal companies, and nothing in the statutory language indicates that Congress sought to limit that protection to publicly traded securities. The value of

the privately held securities at issue is substantial and there is no reason to think that unwinding that settlement would have any less of an impact on financial markets than publicly traded securities.

571 F.3d at 550. Thus, under Sixth Circuit precedent, Section 546(e) applies to the 2005 Transaction at issue here involving the sale of the Notes.

The parties also appear to agree in principle that a "settlement payment" must involve an exchange of consideration and cannot be "a one-way distribution that occurs without commensurate consideration." *In re Greektown*, 2015 WL 8229658, at *6 (citing *Weinman v. Fidelity Capital Appreciation Fund*, 198 B.R. 352 (Bankr. D. Colo. 1996)). As the Defendants acknowledge, "the safe harbor of Section 546(e) is lost when there is no value exchanged for the dividend and no settlement transaction is completed thereby." (ECF No. 19, Appellee's Br. 36, PgID 2680.) Where the parties disagree, and the issue at the heart of this appeal, is whether consideration can be found here based on the totality of the 2005 Transaction, as opposed to the isolated initial event of this "simultaneous" series of events that specified the "dividend" of the proceeds of the Note sale to Monroe and Kewadin for distribution to the Papas and Gatzaros Defendants. The Litigation Trustee argues that the "dividend" portion was a wholly gratuitous transfer from Holdings to its owners [Monroe and Kewadin] that was for no consideration because Holdings never agreed to assume the debts that Monroe and Kewadin owed to the Papas and Gatzaros Defendants and Holdings had

no legal obligation to make those payments. The Litigation Trustee argues that the Court should stop its analysis following the "dividend" from Holdings to Monroe and Kewadin because Holdings (allegedly at a point of insolvency – an allegation not at issue in this appeal) was free to use the proceeds of the Note sale in any manner it chose (having no legal obligation to commit the proceeds to any particular use) and Holdings chose to use the proceeds it received from the sale of the Notes to make a gratuitous transfer to its owners, and that "dividend" is now avoidable under Section 544 and therefore recoverable from the initial transferees (the Papas and Gatzaros Defendants) under Section 550(a). The Court declines to adopt this myopic deconstruction of the 2005 Transaction.

Importantly, "Section 546(e) merely requires a payment be made to complete a securities transaction, it does not limit payment or receipt to particular parties to a multiparty transaction." *Crescent Resources Litig. Trust v. Duke Energy Corp.*, 500 B.R. 464, 474 (W.D. Tex. 2013). Judge Shapero, in his Opinion, observed the following about the multiparty Flow of Funds contemplated in the 2005 Transaction:

> For what it is worth, the Flow of Funds Memorandum, which described the various distributions of money made pursuant to the 2005 Transaction, provided that "[e]ach of the following transactions shall be deemed to have occurred simultaneously," and goes on to describe, among other things, (a) Holdings receiving approximately $182 million pursuant to the terms of the Note Purchase Agreement; (b) Holdings making various distributions from the proceeds of the Note Purchase Agreement to Monroe and Kewadin; (c) Kewadin making various

32

distributions to Monroe; and (d) Monroe making distributions to the Papases of approximately $90 million and to the Gatzaroses of approximately $55 million. Dkt. 278 Ex. D. at 2–5. Notwithstanding these intermediary transfers described in the Flow of Funds Memorandum, the actual mechanics of the transaction was that Holdings directly made the payments by wire transfers from Merrill Lynch to the Papases' and Gatzaroses' bank accounts.

2015 WL 8229658, at *2 n. 5.

The linchpin of the Litigation Trustee's argument is the proposition that Holdings never legally assumed Monroe and Kewadin's obligation to satisfy the Papas and Gatzaros Defendants' redemption obligations because the only asset transferred at the formation of Holdings was Monroe and Kewadin's interests in Greektown Casino and there was no transfer or assumption by Holdings of Monroe and Kewadin's liabilities. The Papas and Gatzaros Defendants dispute this proposition and argue, as Judge Shapero found, that based on the totality of the events that comprised the 2005 Transaction, Monroe and Kewadin, in conveying their interests in Greektown Casino to Holdings, received Holdings' undertaking to issue the Senior Notes to make payments that would allow Monroe and Kewadin to pay the debts to the Papas and Gatzaros Defendants stemming from the 2000 redemption obligations. In support, the Papas and Gatzaros Defendants rely in part on statements made by representatives of Greektown Casino at the September 13, 2005 MGCB meeting, when a proposal to refinance the indebtedness of the Papas and Gatzaros

Defendant through the Greektown Casino, to achieve substantial cost savings through lump sum payments on those redemption obligations, was presented to the MGCB. (ECF No. 12, September 13, 2005 MGCB Regular Meeting at 20-21, PgID 2088-89.) One of the three stated objectives of the proposed refinancing, as explained to the MGCB by counsel for Greektown Casino, was to "fully and finally satisfy the redemption obligations of Monroe Partners, LLC," to the Papas and Gatzaros Defendants. (*Id*. PgID2089.) To address concerns of the MGCB that Greektown Casino, in the initial proposed refinancing, would become directly obligated to assume Monroe's debts to the Papas and Gatzaros Defendants, Greektown Casino proposed an alternative – the creation of Holdings – and shifting that redemption obligation to Holdings. (*Id*. PgID 2092.) At the September 13, 2005 presentation to the MGCB, counsel for Greektown Casino fully acknowledged the responsibility to the Papas and Gatzaros Defendants to resolve the obligations to them and stated that the Casino was "not some scallywag[] who ha[s] walked away from obligations." (*Id*. at 2104.)

In the end, as we now know, the MGCB required the financing structure that involved the creation of Holdings. At the November 15, 2005 MGCB meeting at which the 2005 Transaction was approved, counsel for Greektown Casino again reiterated that through the creation of Holdings, there would be no "shifting of the Monroe obligations to Greektown Casino, LLC," and explained that "[t]he proceeds

of the senior notes will only be used to satisfy the redemption obligations that we've spoken of in regard to both the Papases and the Gatzaroses and the repurchase of certain minority interests." (ECF No. 5, Transcript of the November 15, 2005 Special Public Meeting of the MGCB at 13-14, PgID 1607-08.) When the MGCB issued its formal approval order of the proposed refinancing transaction, the MGCB specified that Holdings "may use the funds obtained through the Debt Transaction only as described in the October 27, 2005 request for approval of Debt Transaction," i.e. to satisfy the redemption obligations to the Papas and Gatzaros Defendants. (ECF No. 5, November 15, 2005 MGCB Approval Order at 6, PgID 1633.) As we now know, the Notes were issued and the proceeds were received by Holdings and used (as directed by the NPA and MBCB Approval Order) to satisfy the redemption obligations to the Papas and Gatzaros Defendants, as contemplated and directed by every historical document and fact associated with the 2005 Transaction.

Despite this history, the Litigation Trustee insists that Holdings had no obligation to use the proceeds of the Note sale to satisfy the debts owed to the Papas and Gatzaros Defendants and that Holdings simply made a gratuitous transfer to its owners, Monroe and Kewadin, who were free to commit the funds to any use of their choice. The Litigation Trustee asks this Court to find error in the Bankruptcy Court's decision to view the 2005 Transaction in light of its undisputed history and purpose,

and to reject Judge Shapero's integration the component parts of the 2005 Transaction to support his finding that the Wire Transfers to the Papas and Gatzaros Defendants indeed were made in exchange for value and constituted settlement payments under the safe harbor provision. But this Court finds that Judge Shapero's decision to integrate the various components of the 2005 Transaction for purposes of analysis and to view them as parts of their larger whole is supported by the record in this case and by persuasive authority for defensive use of the collapsing or integrated transaction doctrine for purposes of finding reasonably equivalent value and defeating an avoidance action by a trustee. *See, e.g. Crescent Resources Litigation Trust v. Duke Energy Corp.*, 500 B.R. 464 (W.D. Tex. 2013) (finding that alleged fraudulent transfer from debtor (subsidiary) to its parent was part of an integrated multi-step transaction that was protected from avoidance under Section 546(e)); *In re Waterford Wedgwood USA, Inc.*, 500 B.R. 371 (Bankr. S.D.N.Y. 2013) (noting that "'fraudulent conveyance law has always exalted substance over form," and "mindful that it need not adhere to labels assigned by the parties, but rather can consider the intent of the parties in structuring the transaction," bankruptcy court collapsed two independent sales that were deemed to have been consummated "substantially contemporaneously" into one to find reasonably equivalent value to defeat the trustee's claim in a fraudulent transfer avoidance proceeding).

*Crescent Resources* is most persuasive here. In *Crescent Resources*, the Defendant Duke Ventures, LLC ("Duke Ventures") was the 100% owner of Crescent Resources, a subsidiary that developed real estate. 500 B.R. at 467. In 2006, Duke Ventures entered into a Formation and Sale agreement with Crescent Resources and several Morgan Stanley entities pursuant to which Duke Ventures would form a holding company, Crescent Holdings, and Duke Ventures would transfer all of its ownership interest in Crescent Resources to Crescent Holdings. *Id.* Crescent Holdings would enter into a credit agreement from which $1,187 billion in term loan proceeds would be distributed to Crescent Holdings, with Crescent Holdings then distributing such proceeds directly to Duke Ventures. Morgan Stanley would purchase 49% of the membership interests in Duke Ventures from Crescent Holdings for $414 million, and Crescent Holdings would enter into an employment agreement with Arthur Fields and issue him 2% interest in Crescent Holdings.[8] *Id.* at 467-68. Ultimately Duke Ventures distributed the funds to its parent, Duke Capital, LLC.

---

[8] Although it was undisputed that the documents called for a distribution of funds to Crescent Resources, who would pass the funds on to Crescent Holdings, who would pass the funds on to Duke Ventures, the trustee argued that this in fact did not occur and that Crescent Resources instead transferred the loan proceeds directly to Duke, bypassing Crescent Holdings. *Id.* at 467 n. 2. The district court found this factually unsupported by the record and, in any event, irrelevant because "Section 546(e) merely requires a payment to be made to complete a securities transaction, it does not limit payment or receipt to particular parties to a multiparty transaction." 500 B.R. at 474.

Three years later, Crescent Holdings, Crescent Resources and other related entities filed for bankruptcy. *Id*. at 469. The litigation trustee moved to avoid the payments to Duke Ventures under § 546(e), claiming that the "entire transaction put $1.6 billion in cash into the pockets of Duke and simultaneously rendered Crescent Resources insolvent." *Id*. at 468.

The Trust argued that "there was no settlement payment made in this case because Crescent Resources simply made '[a] one-way distribution or dividend' to Duke and received nothing in return." 500 B.R. at 472-73. (Alterations and quotation marks in original). Like the Litigation Trustee here, the Trust in *Crescent Resources* argued that "the transfer of the bulk of the term loan proceeds to Duke was essentially a gift (or perhaps an extortion payment), not an exchange of value indicating the completion of any securities transaction." *Id*. at 473. The district court rejected the Trust's argument that the "transaction" should be viewed piecemeal, as a series of separate transactions:

> The first problem the Trust encounters is its own strained reading of the 2006 Duke Transaction. The Formation and Sale Agreement designed a large transaction involving multiple moving parts, but each part was to be moved before the transaction was considered closed. Thus, in describing the "Closing Actions," the Formation and Sale Agreement listed the following: (1) the exchange of membership interests between Duke, Crescent Holdings, and Crescent Resources, which resulted in Crescent Holdings wholly owning Crescent Resources, and Duke Ventures owning 98% of Crescent Holdings (the remaining 2% going to Fields); (2) "simultaneously" with those transfers, a "distribution of

capital" in the amount of $1,187 billion in term loan proceeds from Crescent Resources to Crescent Holdings and on to Duke; and (3) Duke's sale of a 49% interest in Crescent Holdings to the MSREF investors.

500 B.R. at 473. The district court rejected this "myopic view" of the Duke Transaction:

> The Trust would have the Court ignore everything except the distribution of funds to Duke. Such a reading is contrary to the plain language of the painstakingly crafted contractual documents prepared by the parties. There is simply no factual basis for extracting a single aspect of the 2006 Duke Transaction and analyzing it divorced from its context and relationship to the actual transaction. If the distribution had not been made to Duke, the entire transaction would not have closed. If Duke had simply wanted to extract a payment from Crescent Resources unrelated to the transfers of ownership interests between the four parties to the transaction, it could have done so without adding the payment in as a part of the larger transaction. The Trust suggests Duke's internal accounting of the transaction shows the billion dollar distribution was a strategic decision to avoid tax consequences as opposed to a settlement payment. But Duke's accounting tactics do not alter the nature of the "securities transaction" described by the Formation and Sale Agreement.

*Id.* at 473. The district court reasoned that "[a]nalyzing the distribution of funds to Duke as part of the larger 2006 Duke Transaction is the only view of the facts which can be reconciled with the parties' written agreement," and that "viewing the payment in context, Crescent's payment becomes a necessary transfer in the completion of the securities transaction described in the Formation and Sale Agreement." *Id.* at 474. The district court concluded: "Crescent Resources' distribution (through Crescent Holdings) of the term loan proceeds to Duke was a settlement payment within the

39

meaning of Section 546(e) because it was made to complete a securities transaction, namely the 2006 Duke Transaction." *Id*. at 475.

The Litigation Trustee argues that *Duke* is distinguishable because as part of the "transaction," Morgan Stanley received a 49% interest in Crescent Holdings. The Litigation Trustee argues that the dividend paid to Duke was "a precondition to the sale of interests that determined their price." (ECF No. 18, Appellant's Br. at 38, PgID 2614.) However, it is not apparent from the district court's analysis of the settlement payment defense in *Crescent Resources* that the transfer of a 49% ownership interest to Morgan Stanley as part of the larger transaction *was* in fact a pre-condition or *was* a factor of critical or determinative significance in the settlement payment analysis. [9]

---

[9] The Litigation Trustee argues in its Brief on Appeal that "the dividend in Crescent was a precondition to the sale of interests that determined their price." (ECF No. 18, Appellant's Br. at 38.) The Litigation Trustee argues that this transfer of 49% ownership to Morgan Stanley "affected the price of the securities" and therefore was "intricately related" the overall transaction and qualified as a "settlement payment." *Id*. However, the court in *Crescent Resources* discussed the "intricate relationship" of the 49% transfer of ownership to Morgan Stanley in that portion of its opinion analyzing the separate and independent "securities contract" defense of §546. The court did not indicate that this was a dispositive factor in its determination that the dividends were "settlement payments" as defined in § 546. Indeed, in that later section of the opinion discussing the securities contract defense, the court does not find (because it need not for purposes of the securities contract defense) that the failure of the occurrence of the 49% ownership transfer to Morgan Stanley would have invalidated the entire transaction. The court merely observes that had the transfers to the Duke principals not occurred, Morgan Stanley "would presumably have been

The Court finds that here, as in *Crescent Resources*, "[t]here is simply no factual basis for extracting a single aspect of the [2005 Transaction] and analyzing it divorced from its context and relationship to the actual transaction." There can be no dispute that the intent of the 2005 Transaction was to satisfy the redemption obligations to the Papas and Gatzaros Defendants. It is also undisputed that the MGCB Order and the covenants made by Holdings in the NPA required that the proceeds of the Note sale once received by Holdings could be used only to satisfy the redemption obligations to the Papas and Gatzaros Defendants. Viewed as part of its larger whole, there a "triangular exchange of consideration," just as Judge Shapero found, in the Wire Transfers to the Papas and Gatzaros Defendants and those Wire Transfers completed the 2005 Transaction.

Each of the several steps of the 2005 Transaction, described in the Offering Memorandum, the Flow of Funds Memorandum, comments at the September and November 2005 MGCB hearings, the MGCB final Approval Order, and the covenants in the NPA, collectively had as their express purpose the payments to the Papas and Gatzaros Defendants, who had indeed given in return their agreement to accept less

required to pay an additional $581 million (roughly 49% of the term loan proceeds)." 500 B.R. at 476. *See infra*, discussion in Section IIIC relating to the Securities Contract defense. Thus, the Litigation Trustee's suggestion that the court found that the dividend was a settlement payment *because* of the 49% transfer of ownership to Morgan Stanley is not persuasive.

than the full measure of the debt they were owed from Monroe and Kewadin in exchange for the lump sum payments contemplated in the 2005 Transaction. Every facet of this 2005 Transaction expressly contemplated and accepted that the very purpose of the Note sale was to raise funds to satisfy the debts that Monroe and Kewadin owed to Papas and Gatzaros. The undisputed record evidence clearly discloses, as Judge Shapero found, that the "raison d'etre" of the 2005 Transaction was to satisfy the outstanding redemption obligations to Papas and Gatzaros and that a failure of that occurrence could trigger certain events, such as the forced sale of Greektown Casino. (ECF No. 5, MGCB Approval Order at 7, 9.) There can be no real argument that the 2005 Transaction would have failed of its essential purpose had the payments to the Papas and Gatzaros Defendants not been made.

The Sixth Circuit is among those circuits that have demanded a broad interpretation of the term "settlement payment" in § 546. Viewing that term broadly, the Wire Transfers to Papas and Gatzaros were necessary to complete a larger securities transaction, i.e. the NPA, of which the Wire Transfers to Papas and Gatzaros were an integral part. "[V]iewing the payment[s] in context, [the payments to Papas and Gatzaros] become[] a necessary transfer in the completion of the securities transaction described in the [NPA]." *Crescent Resources*, 500 B.R. at 473.

Accordingly, the Court AFFIRMS the Bankruptcy Court's ruling that the Wire Transfers were settlement payments made by or to a financial institution, protected from avoidance under the § 546 safe harbor provision, which serves as an independent basis to GRANT the Papas and Gatzaros Defendants' motion for summary judgment, and DISMISS them from the underlying Adversary Proceeding.

## C.    A Transfer Made In Connection With a Securities Contract

Even were the Court to reject the Papas and Gatzaros argument that the Wire Transfers to them are safe harbored from the Litigation Trustee's avoidance action on the basis of the settlement payment defense, § 546 also shields from a trustee's avoidance reach a transfer made by or to a financial institution in connection with a securities contract.  11 U.S.C. § 546(e).  There is no dispute that the payments in this case were made by MLPFS, a financial institution.  The Litigation Trustee urges the Court to follow a "recent trend" in cases rejecting the application of the safe harbor provision where the financial institution serves as a mere conduit or intermediary in the transaction, serving only to hold the funds temporarily, obtaining no beneficial interest in the funds, and merely forwarding the funds to the ultimate recipient.  *See, e.g., FTI Consulting, Inc. v. Merit Management Grp., LP*, 830 F.3d 690 (7th Cir. 2016) (holding that where a transaction is simply conducted through a financial institution which acts only as a conduit of the funds, the transfer is not covered by the

safe harbor provision).  However, the Sixth Circuit has clearly taken an opposing view of the definition of financial institution.  *See In re QSI*, 571 F.3d 545 (6th Cir. 2009) (bank that acts only as an exchange agent, obtaining no beneficial interest in the funds transferred, still qualifies as a financial institution for purposes of § 546(e)).  Indeed, *QSI* is frequently cited as representing the contra view to that expressed by the Seventh Circuit in *FTI.  See, e.g., In re Quebecor World (USA) Inc.,* 719 F.3d 94, 98 (2d Cir. 2013) (noting a split of authority and placing the *QSI* decision among those that "have concluded that the plain language includes any transfer to a financial institution, even if it is only serving as a conduit or intermediary").  Unless and until the Sixth Circuit changes its position on this issue, this Court must follow *QSI* and concludes that MLPFS qualifies as a financial institution in this case, regardless of the nature of its role in handling the funds that were the proceeds of the sale of Notes under the NPA.  And it is notable that MLPFS's role here, in any event, went beyond simply being the conduit of the funds from one account to another.  MLPFS was the underwriter, initial purchaser of the Notes, the agent for the other purchasers of the Notes and the recipient of the Note proceeds.

The only remaining issue for purposes of the securities contract defense is whether the Wire Transfers were made "in connection with a securities contract."  Papas and Gatzaros argue that the Wire Transfers "were part of a single, integrated

transaction, made in connection with the NPA, a securities contract, and the Redemption Agreements (also securities contracts)." (ECF No. 19, Appellee's Br. at 17.) The Litigation Trustee concedes that the NPA was a "securities contract," but argues that the NPA was complete upon receipt of funds by Holdings and that the Wire Transfers to Monroe and Kewadin and on to Papas and Gatzaros were separate and distinct unrelated transfers of the proceeds of the completed sale of the Notes under the NPA and therefore not "in connection with" a securities contract. The Litigation Trustee argues that to qualify for safe harbor protection under the securities contract defense, the transfers must "complete," or must at least be "the subject," of a securities contract. (ECF No. 18, Appellant's Br. at 55; ECF No. 20, Reply at 15.) The Litigation Trustee argues that the subject of the NPA was the sale of the Notes, not the transfers to Monroe and Kewadin to satisfy the debt obligations to Papas and Gatzaros. The Litigation Trustee submits that "[b]ecause the Dividends had no impact on the Notes themselves, the Dividends were not 'related to' the NPA." (ECF No. 20, Reply at 16.)

The Court has already rejected the Litigation Trustee's position that the initial "dividend" from Holdings to Monroe and Kewadin can be viewed in isolation from the other component parts of the 2005 Transaction. The Litigation Trustee cites no authority in support of its "subject of," or "impact" arguments and its cited authority

for its "completion" argument in fact addresses the "settlement payment" prong of §
546(e), not the less onerous "securities contract" prong.

"In the context of § 546(e), a transfer is "in connection with" a securities
contract if it is "related to" or "associated with" the securities contract." *In re Madoff
Investment Securities LLC (Picard)*, 773 F.3d 411, 421 (2d Cir. 2014). In *Picard* the
Second Circuit first determined that the "account documents" that governed the
depositors' agreements to allow Madoff's investment advisory unit ("BLMIS") to
acquire and dispose of securities on their behalf were "securities contracts" for
purposes of § 546(e). The Second Circuit concluded that although the account
documents did not *require* BLMIS to conduct trades but only *authorized* trades, and
despite the fact that due to the fraud no actual trades were made, the agreements
nonetheless did constitute a "securities contract" as that term is employed in § 546(e):

> [T]he Trustee argues that the Account Documents merely authorize
> BLMIS to conduct securities transactions on behalf of its customers, but
> never expressly obligate BLMIS to carry out any such transactions. . . .
> The trustee might be right that the record reflects no written contract for
> the purchase or sale of a specific security between BLMIS and its
> customers [and that] the Account Documents would not effectuate the
> purchase or sale of any particular security.
>
> But as we have seen, the statutory definition of a "securities contract" is
> not limited the way the Trustee would have us read it, and to the
> contrary, encompasses the relationship created by the Account
> Documents.

773 F.3d at 421. Having found the existence of a "securities contract," the Second

46

Circuit had "little difficulty concluding that the payments BLMIS made to its customers were made 'in connection with' the securities contracts . . . ." *Id*. The Second Circuit reasoned that:

> In the context of § 546(e), a transfer is "in connection with" a securities contract if it is "related to" or "associated with" the securities contract. Here BLMIS promised its customers that it would transact securities, and BLMIS's customers deposited money relying on that promise. This agreement constitutes a securities contract as defined in the statute and the customers' subsequent withdrawals from their accounts were therefore related to, and associated with, this securities contract.

773 F.3d at 421-22. The Second Circuit rejected the trustee's argument that the payments had to have been actually made pursuant to the Account Documents (which of course they were not because of the fraud) in order to meet the definition of "in connection with" a securities contract:

> We are not persuaded. Section 546(e) sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided. Congress could have raised the bar by requiring that the transfer be made "pursuant to," or "in accordance with the terms of," or "as required by," the securities contract, but it did not. Instead, Congress merely required that the transfer have a connection to the securities contract, which these payments do.

773 F.3d at 422.

The Litigation Trustee continues to advance the same argument in response to the securities contract defense that it made in opposition to the settlement payment defense: Holdings was not legally obligated to make the payments to Papas and

47

Gatzaros under the terms of the NPA. Even if true, the "in connection with" language of the securities contract defense does not require a legal obligation to satisfy the "related to" requirement. The securities contract defense has repeatedly been recognized by courts as much broader in scope, and easier to satisfy, than the settlement payment defense. And so it is here. Even if the distributions to Papas and Gatzaros did not "complete" the NPA and were not legally required to be made per the terms of the NPA, and were not "settlement payments," (and the Court has found otherwise) those distributions were "related to" and thus made "in connection with" a securities contract, the NPA, entitling them to safe harbor protection under the securities contract defense of § 546(e).

Accordingly, the Court AFFIRMS the Bankruptcy Court's ruling that the Wire Transfers were made by a financial institution in connection with a securities contract, i.e. the NPA, and are protected from avoidance under the § 546 safe harbor provision, which serves as an independent basis to GRANT the Papas and Gatzaros Defendants' motion for summary judgment, and DISMISS them from the underlying Adversary Proceeding.

## IV.    CONCLUSION

For the foregoing reasons, the Court AFFIRMS the Bankruptcy Court's November 24, 2015 Opinion and December 23, 2015 Order GRANTING the Papas

and Gatzaros Defendants' Motion for Summary Judgment Under 11 U.S.C. § 546(e),

and DISMISSING them WITH PREJUDICE from the Adversary Proceeding.

IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: January 23, 2018

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 23, 2018.

s/Deborah Tofil
Case Manager